All in favor please say 15 and to the side, Mr. Linslip, you have time. Yes, may I please reserve a few minutes? Judge Guy, Judge Batchelden, Judge Kipton, good morning. Salute all. Well, this case, I guess the court's pretty familiar with it by now, it doesn't make a lot of sense to probably rehash the facts. To say briefly though, the interest in it is that it involves a sporting complex, Comerica Park in Detroit, where the defendants supply food and beverage and the people that are going to serve food and beverage to the fans. My client, of course, was the food and beverage manager. Now, the important thing that we stress in the case is that Linda Harrell had been the food and beverage manager since about 2002. For five years she worked under John Goreski. She had never in five years as that position so much as had a write-up or a poor annual performance review. No complaints, nothing. She was an outstanding employee who was so good that it's in the record but I'm not sure that it was mentioned in the brief. She was actually sent to Minnesota to open up their new park and to teach the employees how to handle food and beverage. She received recommendations many, many times from the top echelon of the company, which is out of Buffalo, New York, by the way. In 2007, a fellow by the name of Jeff Baer took over the rest of the place and he became Linda Harrell's immediate supervisor. This guy came from Chicago. As I pointed out in my brief, he came with baggage. The top echelon of the company was aware of problems involving Mr. Baer and he brought those problems with him to Detroit. All of a sudden and in a very short order after being employed in Detroit, Mr. Baer approached Linda Harrell in a sexual way and asked her a number of questions about her sexuality and so forth. She immediately reported that information to Doug Gardner, the human relations director. Gardner didn't do an investigation. He let it go. Shortly thereafter, Baer began to do the same thing to other employees and the reason it's important to Linda Harrell is that these employees were subordinates of Linda's. She was their supervisor. So they came to her, particularly Christine Rulo, whose affidavit I think I'm troubling. She reported it to Linda and Linda went again to Doug Gardner, who again did nothing. No investigation. Instead what occurred, virtually immediately, I believe in July, Linda began to get disciplinary write-ups. Things that had never been accused of before. Now she's being accused of these things and it's Baer that's writing these things up. Let me interrupt just to say, let's assume, and it's not much of an assumption, that Baer would have been delighted to get rid of her under any circumstances. She sort of opened the door to that with her fit of pique when she said, I quit on the thing. That's at least one of the major hooks that they're hanging on.  Because it took three years, Your Honor? Is that what you're saying? That Baer wanted to get rid of her, but yet she stayed employed until 2010? No. I mean, what he means is that phone call and the type of the phone call is just striking in its inappropriateness. And so, you know, an employee who's wonderful one year, a number of years later may have become a problem for many reasons. And so, I mean, and that phone call sort of went on to haunt her. Well, they claimed it was a resignation, but even the district court found that that was not a resignation. What that was was a frantic call for help. Remember what led up to this. As early as 2009, Linda's subordinates began leaving for one reason or another. Christine Rulo left. They didn't hire new people. And I'm not just talking about, you know, a two-week or one-month interview period. They forced Linda Harrell to assume the jobs of at least four people. The culmination of this, Judge Gibbons, was that by April 2010, when the raise that Linda felt would have been appropriate to her subordinate was not agreed to by Baer, then she made the phone call. But it really was a desperate cry for help. Well, she was at work the next day. She didn't resign. And Judge, you said they really wanted to get rid of her. Well, obviously the way they handled this so-called resignation phone call indicated that they did want to get rid of her. But the whole point about it is, I think that there's plenty of evidence that links all of these, what they call them, RACs, these adverse employment write-ups, poor performance reviews, and sticking Linda with the responsibilities of her subordinates, quit and not replacing them. Well, what do you make of the complaints her subordinates made about her? Were they fabricated, or what's your take on that? Some were fabricated. Fabricated by whom? The employees, her subordinates, or by Baer? Judge, one of them, I believe, one of the allegations was that she danced on a table in a bar, and that was the source of the write-up of one. That never happened. And the problem was, when Linda, you saw that Linda responded to these things vigorously. They never gave her the evidence. These were just things that were told, apparently, to Baer. Now, the important one, I think, the one that seems to be touched on the most, is this fag cart incident. You recall that one? Yes. Well, she didn't call anyone a derogatory name. She was referring to a cart. And I'm old enough to remember. Fag carts were cigarette carts you'd push around in. And cigarettes were called fags, I think, at the time. But she referred to a thing as a fag cart and got written up for it, despite her attempt to explain it. So it's clear to me that Baer, well, what do we know happened? No investigations were ever done. Some of these reports of sexual harassment were really serious stuff. And they circled the wagons around Baer, who then began a campaign to write her up. It's no coincidence that a person has no write-ups and nothing but good reviews for five years, and then suddenly this guy comes along and she never has a good write-up again. And she's got three disciplinaries. I don't think that's a coincidence. So what I'm saying here is I was actually – I've got a few minutes left. What's my – When the yellow light comes on, you have one minute left. I've got four minutes. Yeah, the yellow light's on. I'm going to leave it for that for now, and then I'll hold the rest of my comments until my rebuttal, if that's okay. About four minutes? Is that all right? It's all right with us, but I don't think your yellow light is on. We're seeing green. We're seeing green on this side. In any event, you may certainly divide your time as you wish. All right, well, let me say this then to you, if I have the time to point something out. You know from reading my brief that my main criticism of the district court was essentially that the court disaggregated the circumstances and the incidents so as to make them appear to be, you know, each one individually rather minor. What did he call them? General claims of incivility, I think is what he called them. Here's the thing. He did not consider the totality of the circumstances. The district court did not. The court failed to consider, for instance, never mentioned it, that Linda had never had any adverse employment five years before Bear arrived. He never mentioned the fact that despite the complaints of sexual harassment, no investigations were ever done. You won't find that in the district court's decision either. Well, did at any point after the so-called I quit call, when they said we accept your resignation, was there any conversation or documentation saying, and even if you hadn't quit, we were going to fire you because you've been a lousy employee? To the contrary. In fact, even Bear said he had no reason to fire her. See, this is the narrative of the defendants or the appellants in the case, that she quit. Well, the district court found that she did not quit. She was terminated. But Delaware North keeps holding on to this, you know, she quit talking point, and the district court even found that that wasn't credible. I will say, too, just to wrap it up here, that the court never mentioned the fact that Linda was required to do the jobs of others, not for a couple of weeks, but until she left the employment, which was over a year in some circumstances. There was no mention of the poor history that Bear brought with him from Chicago. But there's a written talking points exhibit from the higher-ups in the company that illustrate this. And finally, there was no mention that although the court found that Harold did not resign, the defendants continue, the appellants continue to hang on to this, what I believe is a phony resignation narrative. I asked the court to consider that if the court didn't consider these things, that it didn't consider the totality of the circumstances as required by way of law. Well, are you inviting the district court to weigh the evidence? No, I'm saying to consider the totality as what is required. The court did, in fact, weigh the evidence. I mean, that's the way I look to me. Well, that's not what you do on summary judgment, is it? It shouldn't be. Okay. It shouldn't be, and that's my main complaint. I think under Williams v. GM, the court did the wrong thing. It didn't consider the totality of the circumstances and parsed the claims and granted summary judgment. Thank you. Thank you. Please. Robert Rudolph from Pepper Hamilton on behalf of the appellants, Delaware North and Detroit Sports Services. Briefly, what we have here are two individuals, Linda Harrell and Jeff Baer, who had a very contentious relationship at a minimum. They were both prone to make inappropriate and boorish comments. They were both extremely demanding of their subordinates, and they both ended up being placed on final warnings at the end of Ms. Harrell's career. Ms. Harrell, in fact, resigned. In the fit of pique or for whatever reason, she resigned, thereby opening the door, if you will, to having her depart. When Delaware North decided not to reinstate or rehire her because she was a difficult employee and an unsatisfactory manager, they were acting on the honest belief that she had resigned. There was no obligation to rehire her or rescind that role. Well, she gave you reason to know that whatever she said in the phone call, she wasn't entirely sincere about it because she came back to work. Perhaps she wasn't sincere about that orientation. Well, I mean, she did not. Absent the workplace, she didn't stop doing her job. She didn't do anything else other than pitch a fit in a phone call. I mean, not that that's not serious, but particularly when it's in the middle of the night. I agree. I agree that that was how she wanted the company to understand it. However, she then absented herself from the workplace on a number of days  She did not act in a way that she was— Well, why would you—now, wait a minute. What are you saying? Tell me that again. We said that we were not—Delaware North said that they were not going to accept her resignation. As a result, she left. She then came back a week later to try to argue her case. Does that mean Delaware Northern was willing to give her the chance to continue to work there? No. If they're not accepting her resignation, then— I'm sorry. I misstated. We are accepting her resignation. We aren't accepting her effort to rescind her resignation. Then why would she continue to stay at work after that? That is our point. Her employment was terminated effective that day. Now, the court characterized that as a termination. But you seem to be holding against her the fact that she didn't sit in on the job after they told her they weren't accepting her resignation. I mean, I don't quite understand your point about that. Accepting her resignation. Yes. The point that I'm trying to make is that she did not— She resigned. She intended to and attempted to rescind that resignation. Delaware North, over a period of time, was trying to determine how best to deal with this circumstance. Concluded that it did not need to accept her rescission of that and return her to work being an unsatisfactory reformer. And indeed, that action of trying to rescind her resignation cuts against her claims that she's raising in this case. Indeed, if she is claiming that she was the victim of sexual harassment or a hostile work environment, it seems to argue against the fact that she was being harassed, that she wanted to get her job back. The fact that she was attempting to return to a position that she claimed was being one of discrimination also undercuts that. Essentially, what— Well, she could have been trying to come back to a position where she was being discriminated against in the hope that the discrimination was going to stop. That isn't the way that she characterized it. She claimed that she had a good working relationship with her supervisor, Jeff Baer, that she failed to identify a single individual, a single male individual, who was treated differently than her, only vague allegations that somehow her work was being added to by the departures of some of her subordinates, some of whom specifically claimed that the reason why they were leaving was because they were being abused and harassed by Ms. Harrell. The fact of the matter was that she has three claims in this case, albeit under federal and state law. They had a sex discrimination, a hostile work environment, and finally a retaliation claim. In order to prove those claims, she has to show those persons that were treated differently than she was under similar circumstances. She has failed to do that other than making vague allegations that she was being treated badly, with vague allegations that she was being treated under a hostile work environment, and then relied heavily upon the allegations of others who didn't report those incidents for nearly two years after their termination and never gave the company any opportunity to investigate the circumstances of their events. For her retaliation claim, though, she wouldn't necessarily have to prove that others were treated differently. You could have an isolated incident and then build a retaliation case around that. You're correct, Your Honor. In her instance, however, what she has to show is that there has to be a causal relationship between the protected activity that she engaged in, which was complaining about the actions of her supervisor, and the ultimate act that occurred some 12 months later as Judge Cook concluded that gap between those events was so great that it was hard to draw and impossible to draw a causal nexus between those events. So while we and my opponent has made much of the fact that Judge Cook apparently, he believes, construed the facts disfavorably or not in favor of his client, in fact, the judge acknowledged that there was protected activity, even though these vague allegations did not give Delaware North any opportunity to investigate or determine whether there was any basis, in fact, for that. In fact, specifically in one instance, she requested that they not go to Mr. Bair or to anyone to do those investigations. Moreover, the allegations of any actions that she was involved in were such that they were of a, and getting back to the hostile work environment, if you will, were of either tenuous nature that occurred years before and for which there was no continuing impact, that there were incidents that were of insignificant, isolated, or remote nature, the comment about being called toots by a coworker, and then ultimately her resignation slash termination, as it came about by the court. Strikingly, the lower court noted that she did not lose any money during the course of her employment. In fact, obtained annual increases in bonuses despite her substandard evaluations that she received over that period of time. Of course, that cuts both ways because this awful employee is getting the raises and the bonuses and so forth and so on. So it arguably, in some respects, supports her position too. I think that what it shows is that she was not performing to the level that was expected of her as a manager. She was not being subjected to a process where she was going to be terminated as a result of those performance deficiencies, but she was given a program where she was going to improve. She was, however, subject to discipline on several occasions for making inappropriate remarks or engaging in a contentious workplace, especially with her supervisor, but in other cases with her subordinates. So she has both a, even if we assume for the purposes of the motion and this appeal, that they were an average evaluation, and she received compensation during that period of time. She also received disciplinary notices for that. She was a difficult employee who was, in fact, continuing to disrupt the workplace. Well, I guess the fat question in this litigation, if it were to go to trial, would be whether she was a difficult and contentious employee or whether she was working for somebody who is impossible and there was a very stressful environment created in which everybody was apt to be a little more volatile. Judge, I think I would phrase it differently. Well, I'm not. But, I mean, if the case went to trial, I mean, it doesn't harm you to admit that there's a whole lot in this record that does not reflect favorably on either Bayer or Harrell. I agree with that completely, and that's why I would open my remarks with that. I don't see defending the conduct of either of these two individuals. In fact, my sense of it, and I think the sense of the EEOC investigator who reopened the investigation on this case, was that these two individuals were very much alike and that that was part of the contention that's here. The important part, however, is not whether they were both difficult employees. It's not an issue whether they had a personality conflict as a result of that. What is at issue is whether Delaware North and Detroit Sports Services were engaged in activities that resulted in sex discrimination, sexual harassment or a hostile work environment, and retaliation. Those are the issues that are there. And on those points, Ms. Harrell has the obligation to come forward with genuine issues of material fact which require the lower court to deny summary judgment against a fully developed summary judgment brief. She failed to do so. She failed to identify anyone who was treated differently. She failed to identify any causal relationship between her leg-protected activity and the adverse employment action that she claims that she suffered. And she's failed to come up with sufficient evidence that a reasonable person or a reasonable employee would determine to be a severe and pervasive hostile work environment that was both objectively hostile and query whether it was indeed subjectively hostile in her mind. To that end, it is the obligation of the non-moving party, and we have done so, to come forward with sufficient, undisputed facts. The facts that were presented were not only the undisputed facts from the plaintiff's writings, from the plaintiff's testimony, but undisputed facts from others in the organization who have presented information that she was not alone subjected to taking on additional responsibilities in the workplace. Did Bayer unilaterally have the right to say, we're not going to accept your withdrawal of your I quit statement, or did some upper management have to sign off on all of that also? Indeed, there were three levels of people that were involved in looking at this. Doug Gardner, who is the HR Director, listened to the tape and concurred with Mr. Bayer. They are peers, if you will, in the Detroit office. Concurred with him in what, that she said the words I quit? Yes, and that they should accept that. Were they deciding that her intent was to quit, or were they deciding that even if that was not her intent, that this whole outburst was conduct for which she could be terminated? Mr. Gardner believed that it was conduct that indicated that she was resigning and that that was her intent. The next level of persons that went up to was John Verespy, who was the former Director for the Detroit office, and he was Mr. Bayer's boss. According to the plaintiff, and we have to accept for the purposes of this statement, although he doesn't testify to that, he said that he didn't want her to resign and that he was going to look into it. He then went to the next person, which is Ms. Davenport, who is the overall HR person for the region, and she in turn listened to it and concluded with Mr. Bayer and Mr. Gardner that she intended to be terminated and that she should be terminated in light of all the past. Why didn't they just ask her what her intent was? She had indicated her intent. I mean, she's back at work by this time. I mean, actions speak louder than words ordinarily. So, I mean, if they were all interested in her intent, it seems like the simpler and more direct thing to do rather than listening to a conversation, or not a conversation, but a message left in the middle of the night might have been to talk to her about the fact that she came in the next day. The fact of whether her intent to return to work was whether the company was willing to receive her. So why are all the managers examining this to determine her intent if what they really cared about was whether it not mattering her intent, they weren't going to let her come back to work? To determine... I mean, that just sounds like... And then make it very clear. One of the other reasons why they were concerned about how to determine what to do with Ms. Harrell is the very reason why we're standing here. They wanted to determine whether they had done the right thing, whether they had acted in a way that was proper within the meaning of the law, whether they had acted in terms of the investigations, in terms of the actions that she alleges to determine whether there was any claim that she could make of discrimination or otherwise because Ms. Harrell was indeed a contentious and litigious person. So most employers, and indeed Delaware North, when dealing with Linda Harrell, wanted to make sure that they were correct in making the assumptions that they were making. And I think that... Sounds more that they were looking at whether they had a basis for terminating her or not accepting her resignation. And came to that conclusion, and that was indeed what Judge Cook and the lower court determined in this case, and that that action was not discriminatory, retaliatory, or based on any kind of harassment or hostile work environment. And I thank the court for the opportunity to present our case. Thank you, counsel. Just briefly add on a couple of things. First of all, I thought I brought with me the transcript of that phone call, but I didn't. However, in listening to that phone call, there's no question it's a cry for help. She said to Jeff Baer in that phone call, we have got to sit down and talk. Does that sound like a person who's quitting? Really, it is totally contrived. And once they had that phone recording, voicemail, that was what the defendants held onto with both hands in testifying for termination. The district court didn't buy it either. I want to also just point out, in brief, before I go, that remember that talking points memo I was talking about that was signed? Actually, one of the people that signed it was Doug Gardner. Another was Veresky, and I believe the president of the company also signed it. But it said to him, and nobody took ownership of writing it, but he made comments like this when confronted by employees, you'll pay for it. Now, whether this was said or inferred directly or indirectly, this is typical of your leadership style. He said, I will find out who called Buffalo and make their life miserable. That's Jeff Baer. I'm telling you, he's got baggage here. This had nothing to do with two strong personalities going after each other. Veresky, stellar man. He was a really good person, and he stood behind Linda all the way. Something took a direct turn south, and that's when Linda Harrell engaged in her particular activity. Well, didn't Veresky have the authority to hire and fire Baer? Yeah, he did. I mean, if he had accepted this version of facts and he knew what a good employee Linda was, as Harrell was, it looks like he might have. Well, you're right, Your Honor, but here's the thing. Veresky told Linda, I don't want you to quit, and I'll look into it. She never heard from him again, so we don't know what Baer did. We just don't know. But having stated those points, look, all I'm saying is this. There's plenty in this record to go to a jury. I think it was improper for the district court simply to decide the facts one way or the other, and there are points to be made. I mean, the letter of the employee who quit because allegedly Linda was a bad supervisor or something like that. Well, okay, now that's a fact contra, but let a jury decide that rather than the district court. But Baer did not have the authority to fire Ms. Harrell, right? Judge Gibbons, I'm not clear on it, to be honest with you. I just am not clear on that, whether he did or not. I know he talked to Gardner. I know apparently they sat around and listened to the tape, but anyone who listens to that tape knows that it was not a resignation cry for help. Thank you. Anything further? Thank you. I think not. Thank you, counsel. The case will be submitted.